*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

GREAT LAKES CAPITAL FUND MICHIGAN
COMMUNITY LIMITED PARTNERSHIP XX,
GREAT LAKES CAPITAL FUND FOR HOUSING
LIMITED PARTNERSHIP XXV, and GL-PALMER
PARK SQUARE DETROIT LLC,

UNPUBLISHED
May 13, 2025
10:04 AM

Plaintiffs/Counterdefendants-
Appellees,

and

PALMER PARK SQUARE LIMITED DIVIDEND
HOUSING ASSOCIATION LIMITED
PARTNERSHIP,

Plaintiff-Appellee,

v                                                                  No.  366631
                                                                   Wayne Circuit Court
PALMER PARK SQUARE GP LLC,                                         LC No.  19-001741-CB

Defendant/Counterplaintiff/Third-
Party Plaintiff-Appellant,

and

SHELBORNE DEVELOPMENT COMPANY LLC,
KATHY S. MAKINO-LEIPSITZ, and MARK
LEIPSITZ,

Defendants-Appellants,

and

CINNAIRE CORPORATION,

Third-Party Defendant-Appellee.

Before: M. J. KELLY, P.J., and SWARTZLE and ACKERMAN, JJ.

PER CURIAM.

Defendants appeal a final judgment awarding $5,525,738 to plaintiffs. They challenge the trial court's prior orders granting summary disposition in favor of plaintiffs on both plaintiffs' claims and defendants' counterclaims, and adopting the special master's recommendation that Section 9.6 of the parties' Partnership Agreement does not constitute an impermissible penalty. We affirm.

I. FACTS

This case arises from a dispute among parties to the Palmer Park Square Limited Dividend Housing Association Limited Partnership (the Partnership). The Partnership was formed for the express purpose of acquiring and operating a low-income housing project consisting of 202 residential units in Detroit's Palmer Park Square.

Plaintiffs are Investor Limited Partners who contributed approximately $15 million in capital: Great Lakes Capital Fund Michigan Community Limited Partnership XX, Great Lakes Capital Fund for Housing Limited Partnership XXV (Fund 25), and GL-Palmer Park Square Detroit, LLC. Defendants include Palmer Park Square GP LLC (PPS-GP), the original general partner, and Shelborne Development Company LLC, Kathy S. Makino-Leipsitz, and Mark Leipsitz, who served as guarantors for PPS-GP's obligations. PPS-GP and the Investor Limited Partners are parties to a Partnership Agreement. Third-party defendant Cinnaire Corporation is a nonprofit that acts as manager or general partner for the Investor Limited Partners.

Under the Partnership Agreement, PPS-GP was tasked with securing historic rehabilitation tax credits for the project. To induce plaintiffs to invest, Shelborne, Makino-Leipsitz, and Leipsitz executed an Unconditional Guaranty covering PPS-GP's obligations, including securing the tax credits. Section 9.6 of the Partnership Agreement permits the Investor Limited Partners to remove the general partner under specified conditions, and provides that upon removal, PPS-GP's interest would be redeemed for $100.

The parties later executed a Memorandum of Understanding (MOU), acknowledging PPS-GP's failure to fulfill many obligations under the Partnership Agreement, including securing tax credits for four of the six buildings.[1] The MOU also confirmed that PPS-GP materially defaulted on other obligations in the Partnership Agreement; that the Investor Limited Partners had the right

---

[1] The National Park Service (NPS) initially approved the certification request for only one of the six buildings. PPS-GP successfully appealed the denial regarding one additional building. The NPS upheld the denial of tax credits for the remaining four buildings.

to repurchase their interests and remove PPS-GP; and that PPS-GP and the guarantors were liable to the Investor Limited Partners in the amount of $2,814,316.41.

In exchange for plaintiffs forgoing immediate removal of PPS-GP, defendants agreed to work with a "Historic Consultant"[2] "to either appeal or reapply for [the] Historical Rehabilitation Tax Credits." PPS-GP had until July 1, 2017, to secure the tax credits.[3] PPS-GP and the guarantors also agreed to additional conditions, including paying down the construction loan, funding required reserves, and achieving a lien-free completion of a parking lot parcel by December 1, 2017. The MOU further provided that if PPS-GP or the guarantors defaulted on any term, removal of PPS-GP as general partner would be automatic and immediate without further notice.[4]

On September 1, 2017, Fund 25 loaned $52,565.27 to the Partnership, Makino-Leipsitz, Leipsitz, and Shelborne for the purpose of bringing the Partnership "current under their contract with Heritage Consulting as it relates to the delivery of federal historic tax credits." The loan agreement further provided that the entire principal was due by September 1, 2018.

Despite these agreements, defendants failed to (1) secure the tax credits by July 1, 2017; (2) pay off the MSHDA construction loan by December 1, 2017; (3) fund the MSHDA and Investor Limited Partner reserves by December 1, 2017; and (4) repay the $52,565.27 loan Fund 25 made to assist with Heritage Consulting's fees. Accordingly, on September 11, 2018, the Investor Limited Partners removed PPS-GP as general partner and redeemed its interest for $100, consistent with Section 9.6 of the Partnership Agreement.

On February 6, 2019, plaintiffs filed their complaint, alleging: Count I–breaches of the Partnership Agreement, the guaranty, and the MOU; Count II–breach of the loan agreement and promissory note; and Count III–accounting. In an amended counterclaim and third-party complaint, defendants alleged: Count I–breach of the Partnership Agreement (against the Investor Limited Partners); Count II–breach of fiduciary duty (against the Investor Limited Partners); Count

---

[2] Makino-Leipsitz selected Heritage Investment Corporation to serve as the Historic Consultant.

[3] Specifically, "[t]he General Partner and Guarantors [had] until July 1, 2017, to either secure the Historic Rehabilitation Tax Credits for the entire Project or pay the amount due and owing to the ILP, which amount as of the date hereof [was] $2,814,316.41 . . . ."

[4] The "default" paragraph, ¶ 6, of the MOU provides as follows:

> In the event that the General Partner or Guarantors fail to meet any of the obligations or deadlines set forth in 1-4 above, unless an extension is granted by the ILP [Investor Limited Partners] in writing in its sole discretion, then the General Partner and Guarantors shall be in Default of this Agreement. In such case, the General Partner's removal from the Partnership shall be deemed effective immediately. In such event, General Partner hereby irrevocably appoints the ILP (with full power of substitution) as its attorney-in-fact for the purpose of executing, acknowledging, swearing to, recording and/or filing any amendment to the Partnership Agreement and the Certificate necessary or appropriate to confirm the foregoing. [Emphasis omitted.]

III–declaratory judgment (seeking the MOU to be declared void); Count IV–declaratory judgment (seeking reinstatement of PPS-GP as general partner); Count V–declaratory judgment (seeking a ruling that Section 9.6 of the Partnership Agreement is an illegal penalty); Count VI–civil conspiracy to tortiously interfere with the Partnership Agreement (against the Investor Limited Partners and Cinnaire); Count VII–concert of action (against the Investor Limited Partners and Cinnaire); and Count VIII–tortious interference with the Partnership Agreement (against the Investor Limited Partners and Cinnaire).

Plaintiffs and Cinnaire moved for summary disposition under MCR 2.116(C)(10) on all claims and counterclaims, arguing that there was no genuine issue of material fact that defendants breached the Partnership Agreement, the guaranty, the MOU, and the loan agreement, and that defendants' counterclaims failed as a matter of law. Defendants opposed the motion and cross-moved for summary disposition, contending that plaintiffs had first breached the Partnership Agreement by impermissibly exercising control over the Partnership, preventing defendants from obtaining tax credits. Defendants also averred that Section 9.6 of the Partnership Agreement was an illegal liquidated-damages provision because the $100 redemption was "wildly disproportionate" to the value of the general partner's interest.

In a written opinion, the trial court granted plaintiffs' motion, denied defendants' motion, and issued a written opinion. The court ruled that the MOU was a valid contract because the Investor Limited Partners' forbearance on collection of the balances owed, as well as their agreement to leave the general partner in place, constituted sufficient consideration. Consequently, with no question of fact that defendants breached the various contracts, the court ruled that plaintiffs were entitled to summary disposition on those claims. The court also rejected defendants' contention that it was plaintiffs who first breached the Partnership Agreement. The court noted that the MOU granted the Investor Limited Partners the ability to remove PPS-GP as general partner and that defendants cannot complain that they were precluded from pursuing litigation against the National Park Service (NPS) when they expressly agreed to not pursue that action in the MOU. The trial court also granted summary disposition on defendants' counterclaims and third-party complaint, but did not expressly address defendants' Count V, challenging Section 9.6 as an illegal penalty.

Subsequently, the trial court entered a stipulated order appointing a special master to address damages, later amended to allow the special master to "adjudicat[e]" the legality of Section 9.6. The special master concluded Section 9.6 of the Partnership Agreement was not an illegal penalty. Defendants filed objections, reiterating their arguments that Section 9.6 constituted an illegal penalty because the Investor Limited Partners' damages were easily calculable and that the $100 redemption price was unconscionable relative to the actual amount of the interest, which was at least $2.4 million. Defendants further argued that the Investor Limited Partners' claimed contractual damages of $5.6 million would make them completely whole, making their retention

of $2.4 million in partnership interest a windfall. The trial court overruled defendants and adopted the special master's findings.[5]

## II. JURISDICTION

Before addressing defendants' primary appellate arguments, we first consider their contention that this Court lacks jurisdiction because the final judgment did not dispose of all claims. Although unusual—because defendants are the appellants—the argument is without merit.

This Court's jurisdiction over an appeal of right is set out in MCR 7.203(A), which provides:

> The court has jurisdiction of an appeal of right filed by an aggrieved party from the following:
>
> (1) A final judgment or final order of the circuit court, or court of claims, as defined in MCR 7.202(6) . . . .

A "final judgment" or "final order" in a civil case is defined in relevant part as "the first judgment or order that disposes of all the claims and adjudicates the rights and liability of all the parties, including such an order entered after reversal of an earlier final judgment or order." MCR 7.202(6)(a)(i).

Defendants assert that the trial court's judgment was not final because it did not expressly resolve defendants' Count VI (civil conspiracy) or plaintiffs' Count III (accounting). The argument lacks merit. As to defendants' Count VI, that is simply incorrect. In its opinion, the court cited *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 382; 689 NW2d 145 (2004), for the proposition that "[a] plaintiff, who is party to a contract, cannot maintain a cause of action for tortious interference against another party to the contract." The trial court therefore disposed of Count VI.

As to plaintiffs' Count III, the trial court's final judgment referenced its prior order granting plaintiffs' motion for summary disposition. In that earlier order, the court "granted" plaintiffs' motion and "denied" defendants' competing motion. While plaintiffs did not make any explicit argument related to their Count III in their motion, they nonetheless moved for summary disposition "on their claims" and moved to dismiss defendants' counterclaims and third-party complaint "in its entirety." Thus, because the trial court granted plaintiffs' motion—which sought summary disposition on *all* of their claims—the court's order necessarily disposed of Count III as well. The fact that plaintiffs did not refer to that count in their motion is not dispositive.[6]

---

[5] While defendants' objections were pending in the trial court, the parties stipulated that plaintiffs' damages totaled $5,581,900, subject to the court's ruling on Section 9.6.

[6] Admittedly, the fact that the trial court treated the other count it failed to expressly resolve— defendants' Count V in their counterclaim—as a still-live count after its broad grant of summary disposition cuts against this reasoning. However, plaintiffs assert that they abandoned this claim

Therefore, the final judgment is a final order under the court rules, and we have jurisdiction to hear the appeal as of right.

## III. SUMMARY DISPOSITION

This Court reviews a trial court's decision on a motion for summary disposition de novo. *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008). A motion brought under MCR 2.116(C)(10) tests the factual support for the claim. *Spiek v Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998). "In evaluating such a motion, a court considers the entire record in the light most favorable to the party opposing the motion, including affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties." *Corley v Detroit Bd of Ed*, 470 Mich 274, 278; 681 NW2d 342 (2004). Summary disposition is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Kisiel v Holz*, 272 Mich App 168, 170; 725 NW2d 67 (2006).

To the extent this case involves the interpretation of a contract, that also presents a question of law subject to de novo review. *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008). "The goal of contract interpretation is to first determine, and then enforce, the intent of the parties based on the plain language of the agreement." *Harbor Park Market, Inc v Gronda*, 277 Mich App 126, 130; 743 NW2d 585 (2007). The plain and unambiguous language of a contract must be enforced as written, unless contrary to law or public policy. *Id*.

## IV. DISCUSSION

### A. BREACH OF THE PARTNERSHIP AGREEMENT AND MOU

Defendants first argue that the trial court erred by granting summary disposition to plaintiffs on their breach-of-contract claim. We disagree.

In Count I of their complaint, plaintiffs alleged that defendants breached Paragraphs 2, 3, and 4 of the MOU.[7] Paragraph 2 required defendants to obtain IRS Form 8609 for the project by July 1, 2017. Paragraph 3 required them by the same date either to secure the historic rehabilitation tax credits or to pay the $2,814,316.41 due and owing to the Investor Limited Partners. Paragraph

in the trial court, and the fact that defendants did not notice the trial court's alleged failure to rule on plaintiffs' Count III until preparing their brief on appeal tends to confirm plaintiffs in this regard. See, e.g., *Mich Heritage Bank v Fed Ins Co*, unpublished per curiam opinion of the Court of Appeals, issued August 12, 2004 (Docket No. 245832), p 6 ("[W]e deem plaintiff to have abandoned its equitable and statutory claims by not seeking an answer from the trial court regarding these claims after the trial court's denial of defendant's cross-motion for summary disposition and before entry of the final judgment."). Whether Count III was adjudicated or abandoned, we see no derogation from the finality of the trial court's judgment.

[7] Although plaintiffs alleged breach of "the Partnership Agreement, the Guaranty, and/or the MOU," their claim specifically focused on defendants' failure to perform obligations memorialized in the MOU.

4 required defendants by December 1, 2017, to: (1) pay down the construction loan; (2) reach a final closing with MSHDA; (3) fund all MSHDA and Investor Limited Partners required reserves; and (4) provide evidence of lien-free completion of the parking lot parcel.

In their motion for summary disposition, plaintiffs focused on defendants' breaches of Paragraphs 3 and 4 and did not argue that defendants breached Paragraph 2 by failing to obtain IRS Form 8609. Defendants contend that this omission bars summary disposition on Count I. However, defendants cite no authority supporting the proposition that plaintiffs' failure to argue and address any Paragraph 2 breach means that summary disposition was improperly granted on the claims related to the Paragraph 3 and 4 breaches. Defendants' failure to satisfy *any* provision of the MOU constituted a breach of the contract if it damaged plaintiffs. At best, plaintiffs abandoned any claim related to a Paragraph 2 breach when they moved for summary disposition on *all* of their claims without addressing that particular aspect of the claim. But the abandonment of that particular claim has no effect on the other two claims they successfully addressed. In other words, defendants have offered no cogent argument that, assuming that the trial court erred by including this aspect of the claim in its order,[8] this treatment of Count I prejudiced defendants and entitled them to any relief.[9]

Moreover, defendants do not dispute that they failed to fulfill their obligations under Paragraphs 3 and 4 of the MOU. Instead, they submit that plaintiffs' own prior breach precluded them from maintaining their contract claims. It is true that a party "who first breaches a contract cannot maintain an action against the other party for his subsequent breach or failure to perform." *Michaels v Amway Corp*, 206 Mich App 644, 650; 522 NW2d 703 (1994) (cleaned up). Defendants aver that plaintiffs breached Section 5.1 of the Partnership Agreement, which provides, in pertinent part, that the general partner would have "full and exclusive control over the affairs of the Partnership," and Section 6.2 of the Partnership Agreement, which provides that the Investor Limited Partners would "not participate in the operation, management or control of the Partnership's business." Defendants contend that plaintiffs, through Cinnaire, wrongfully took control of the process to obtain the tax credits, thereby breaching the Partnership Agreement first.

There are two fatal flaws in defendants' argument. First, the alleged exertion of control by the Investor Limited Partners occurred *after* the parties executed the MOU. By that time, defendants had already acknowledged material defaults under the Partnership Agreement. That means that while defendants were precluded from bringing any breach-of-contract claims based on the Partnership Agreement, plaintiffs were not. Second, defendants offer no serious allegation

---

[8] To be clear, the trial court did not address this particular aspect of plaintiffs' Count I. It instead framed the breach-of-contract count as being premised on (1) the failure to secure the tax credits or repay the Investor Limited Partners, (2) the failure to pay down the construction loan, (3) the failure to close with the MSHDA, (4) the failure to fund the MSHDA and Investor Limited Partners' reserves, and (5) the failure to complete a lien-free parking lot.

[9] Indeed, in the parties' stipulation of damages, there is no listing for any damages attributable to the failure to obtain the IRS tax forms.

that plaintiffs breached the MOU itself.[10]  Accordingly, defendants' claim that plaintiffs are precluded from maintaining their breach-of-contract actions is misplaced.

Moreover, there is no evidence that plaintiffs unilaterally "took control" of the Partnership. Defendants argue that the Investor Limited Partners and Cinnaire demonstrated this control by (1) refusing to allow PPS-GP to pursue a lawsuit to overturn the NPS's decision denying the tax credits and (2) discovering Heritage as a consulting group.  While defendants submitted evidence showing that the Investor Limited Partners desired to pursue a second appeal instead of initiating a lawsuit, there is no evidence that the Investor Limited Partners "controlled" the process.  Instead, the parties in the MOU agreed to allow PPS-GP to engage Heritage for the purpose of either appealing the denial of the tax credits or reapplying for them.  There was no provision for pursuing a separate lawsuit.  Therefore, any of defendants' assertions on appeal in this Court that they were unfairly precluded from filing a lawsuit is without merit based on their express approval of pursuing other avenues to obtain the tax credits.  Simply put, by agreeing to the terms of the MOU in exchange for PPS-GP not being removed as general partner, defendants waived any right to pursue a lawsuit against the NPS, and the fact that they could not pursue a lawsuit does not demonstrate any unwarranted control by the Investor Limited Partners.

Defendants also argue that Cinnaire demonstrated its control by its discovery and selection of Heritage.  Although defendants assert that the Investor Limited Partners dominated the tax-credit process, the record shows that Makino-Leipsitz herself found Heritage.  Josh Ghena from Cinnaire also testified that PPS-GP recommended using Heritage.[11]

Defendants further argue that the Investor Limited Partners exerted control by preventing Makino-Leipsitz from attending the NPS appeal.  But again, there is no evidence to support that assertion.  The evidence shows that it was Heritage's recommendation, as the Historic Consultant, that Makino-Leipsitz should not attend the subsequent appeal in Washington, D.C., and that Ghena, on behalf of Cinnaire, was simply reiterating that view.  Notably, neither Heritage nor Cinnaire actually forbid her from attending.  John Tess, the President of Heritage, stated that it was his opinion that Makino-Leipsitz's presence was not desired at the hearing because he felt that Makino-Leipsitz had "worn out her welcome" with the NPS appeals officer.  Tess also was

---

[10] While defendants claim that the Investor Limited Partners breached Section 5.1 (providing that the general partner had "full and exclusive control over the affairs of the Partnership") and Section 6.2 (providing that the Investor Limited Partners "shall not participate in the operation, management or control of the Partnership's business") of the Partnership Agreement, they also cursorily mention Paragraph 3 of the MOU.  Paragraph 3 imposes no obligation on the Investor Limited Partners; it solely requires defendants either to secure the Historic Rehabilitation Tax Credits or pay $2,814,316.41 by July 1, 2017.

[11] Ghena testified that before PPS-GP recommended Heritage, he had independently encountered Heritage during his own research.  Defendants curiously cite this page in Ghana's deposition for the proposition that it was Cinnaire who "found" Heritage.  While Cinnaire knew of Heritage's existence before PPS-GP recommended using Heritage, it is hard to see how that fact demonstrates any "control."  The undisputed fact is that it was PPS-GP and Makino-Leipsitz who independently found and recommended Heritage.

concerned that Makino-Leipsitz could not stay focused on the arguments Heritage thought were important for the hearing. Tess stated that Makino-Leipsitz was never "forbidden" from attending the hearing; instead, it was strongly recommended that she not attend. Likewise, reviewing the e-mails that Ghena sent to Makino-Leipsitz about her attendance at the hearing reveals that he never mandated her nonattendance. Instead, Ghena expressed his strong opinion that she should not attend and "requested[ed] that [she] confirm in writing whether or not we can find agreement to this issue." Additionally, when Makino-Leipsitz requested that another representative of Shelborne attend the hearing, Ghena expressed his disapproval and again sought her "agreement as to how this will be handled." Seeking agreement is not the same as controlling the process—particularly when Cinnaire (via Ghena) was only expressing a preference that Makino-Leipsitz follow the advice provided by Heritage, the consultant defendants agreed to retain in the MOU. There is no evidence to show that Makino-Leipsitz did not ultimately agree with Heritage and Cinnaire's requests. Makino-Leipsitz and Shelborne's acquiescence to the requests does not make Cinnaire's actions "controlling."

In short, defendants' position that plaintiffs first breached the Partnership Agreement or the MOU is misguided. The evidence shows that Makino-Leipsitz engaged Heritage for the purpose of pursuing a second appeal, and that is what happened. Under Heritage's suggestion, which Cinnaire and the Investor Limited Partners endorsed, Makino-Leipsitz and Shelborne were strongly encouraged not to attend. A suggestion—even a strong one—is not controlling behavior. Cinnaire sought Makino-Leipsitz's concurrence, and there is no evidence that Makino-Leipsitz was otherwise prevented from attending.

Defendants also argue that plaintiffs are not entitled to judgment because they suffered no damages from defendants' failure to pay off the MSHDA loan. Defendants assert that because MSHDA has not demanded payment, plaintiffs have incurred no actual loss. However, defendants cite no authority for the proposition that a demand for payment is necessary to establish damages. The fact that a debt remains outstanding is sufficient injury to support a breach-of-contract action.

## B. PLAINTIFFS' REMAINING CLAIMS

Defendants next challenge the trial court's grant of summary disposition to plaintiffs on their remaining claims. Again, we disagree.

Regarding plaintiffs' Count II—the loan related to Heritage Consulting—defendants correctly observe that Fund 25 made the $52,565.27 loan, but that the trial court's judgment awarded repayment to all plaintiffs collectively. Technically, only Fund 25 should have been awarded repayment. Nevertheless, defendants demonstrate no prejudice. The amount owed remains the same, and principles of res judicata, satisfaction, and waiver would bar any future double recovery.

As for plaintiffs' Count III accounting claim, defendants contend that the trial court improperly granted summary disposition because plaintiffs did not substantively argue this count during the summary-disposition proceedings. Even assuming that is true, defendants fail to explain how they suffered any prejudice. There is no evidence that the judgment required defendants to pay any amount specifically related to an accounting. Nor is there any indication that defendants were compelled to provide an accounting or comply with any court-ordered obligations tied to this

claim. Plaintiffs have also stated that they voluntarily abandoned the accounting claim at the trial court level. Because defendants identify no prejudice resulting from the court's dismissal of the accounting claim, and because no effective relief is available, this argument does not warrant reversal.

## C. DEFENDANTS' CONTRACT-BASED COUNTERCLAIMS

We now turn to the trial court's decision to grant summary disposition in favor of plaintiffs and Cinnaire on defendants' counterclaims and third-party complaint. For the reasons explained earlier, defendants' argument that the Investor Limited Partners breached the Partnership Agreement and MOU by improperly controlling the Partnership after the MOU was executed is without merit.

Defendants also contend that, with respect to their Count I breach-of-contract claim, the Investor Limited Partners breached the Partnership Agreement by impermissibly removing PPS-GP as the general partner without obtaining the required consents from MSHDA and the City of Detroit. Section 9.6 of the Partnership Agreement provides, in relevant part, that: "Subject to the prior written approval of the [MSHDA] and the City of Detroit, and any other Lender, if required, the Fund, on behalf of the Investor Limited Partners, shall have the right to remove and replace the General Partners . . . ." Plaintiffs contend that Paragraph 5 of the MOU, executed later, governs the removal process and dispenses with any requirement for prior written approvals. Paragraph 5 states:

> Removal Notice. Section 9.6 of the Partnership Agreement provides for a sixty (60) day notice and cure period in the event that the ILP determines to remove the General Partner, unless a shorter period is otherwise deemed necessary in the sole discretion of the ILP to protect the Partnership or the interests of the ILP from material harm. The General Partner and Guarantors acknowledge that this Agreement constitutes notice pursuant to § 9.6 of the Partnership Agreement that if the General Partner or Guarantors are in Default of the terms of this Agreement, the ILP will immediately remove and replace the General Partner without further notice or time to cure or perform. ILP's agreement to delay the enforcement of its many remedies under the Partnership Agreement as well as to not immediately remove the General Partner is expressly conditioned upon General Partner's and Guarantors' execution of this Agreement and acknowledgement that *the General Partner's removal will be immediate, automatic, uncontested, and fully enforceable against the General Partner upon the General Partner's or Guarantors' Default of this Agreement*. [Emphasis added.]

Similarly, Paragraph 6 of the MOU provides:

> Default. In the event that the General Partner or Guarantors fail to meet any of the obligations or deadlines set forth in 1-4, above, unless an extension is granted by the ILP in writing, in its sole discretion, then the General Partner and Guarantors shall be in Default of this Agreement. In such case, *the General Partner's removal from the Partnership shall be deemed effective immediately*. [Emphasis added.]

-10-

When two contracts conflict, the later-executed agreement controls. See *Archambo v Lawyers Title Ins Corp*, 466 Mich 402, 414 n 16; 646 NW2d 170 (2002). Taken together, the MOU's terms unambiguously establish that upon default by PPS-GP or the guarantors, removal of PPS-GP would be immediate and automatic—without any condition requiring additional consent from MSHDA or the City of Detroit. Defendants' argument that MSHDA consent was still required ignores the plain terms of the MOU. While plaintiffs may have sought such consents out of an abundance of caution, the MOU authorized immediate removal without them. Indeed, a representative from MSHDA indicated that "per [the] agreements," "the Investor Limited Partners do not need MSHDA's approval to move ahead with [the removal] rights."

Defendants complain that the trial court effectively rewrote the Partnership Agreement by dispensing with the consent requirement. But it was defendants themselves who, in signing the MOU, modified the earlier agreement. Accordingly, because there was no genuine question of material fact regarding PPS-GP's removal, the trial court properly granted summary disposition on this aspect of defendants' Count I and Count IV.

Defendants next reference their Count VI (civil conspiracy to tortiously interfere with the Partnership Agreement) and Count VIII (tortious interference with a contract). Defendants aver that the trial court never addressed these counts. However, as discussed in our jurisdictional analysis, the trial court explicitly did so, relying on *Derderian*, 263 Mich App at 382, which held that "[a] plaintiff, who is a party to a contract, cannot maintain a cause of action for tortious interference against another party to the contract." Because PPS-GP and the Investor Limited Partners were both parties to the Partnership Agreement, PPS-GP cannot bring a tortious interference claim against them. Moreover, it is well-established that a civil conspiracy claim requires proof of an underlying actionable tort. *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365, 384; 670 NW2d 569 (2003), aff'd 472 Mich 91 (2005). Thus, without a viable tortious interference claim, defendants' civil conspiracy claim also fails as a matter of law.

Defendants argue that even if the Investor Limited Partners cannot be liable, Cinnaire, acting as their agent, could be liable for tortious interference if it acted solely for its own benefit. We disagree. As addressed in *Reed v Mich Metro Girl Scout Council*, 201 Mich App 10, 13; 506 NW2d 231 (1993):

> To maintain a cause of action for tortious interference, the plaintiffs must establish that the defendant was a "third party" to the contract or business relationship. As noted above, defendant Bailer is the executive director and chief executive officer of the Michigan Metro Girl Scout Council. It is now settled law that corporate agents are not liable for tortious interference with the corporation's contracts unless they acted *solely* for their own benefit *with no benefit to the corporation*. [*Id.* (citation omitted; emphasis added).]

In *Reed*, summary disposition was proper where the plaintiffs did not show that Bailer was acting "strictly for her own personal benefit," without any benefit to the principal. *Id*. Similarly here, defendants offered no evidence that Cinnaire acted "strictly" for its own personal benefit. In fact, when opposing plaintiffs' motion for summary disposition, defendants alleged that Cinnaire "acted in a manner intended to benefit itself, *and/or the ILPs*." (Emphasis added.) By admitting that

Cinnaire acted at least in part to benefit the Investor Limited Partners, defendants defeated their own argument.

Accordingly, the trial court properly granted summary disposition on defendants' tortious interference and civil conspiracy claims.

### D. LIQUIDATED DAMAGES PROVISION

Defendants submit that the trial court erred when it adopted the special master's conclusion that Section 9.6 of the Partnership Agreement was not an illegal penalty. We disagree.

Whether a contractual provision constitutes an illegal penalty is a question of law this Court reviews de novo. *UAW-GM Human Resource Ctr v KSL Recreation Corp*, 228 Mich App 486, 508; 579 NW2d 411 (1998). A court's findings of fact are reviewed for clear error.[12] *Zoran v Cottrellville Twp*, 322 Mich App 470, 475; 913 NW2d 359 (2017). Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id*.

Section 9.6 of the Partnership Agreement, while extensive, includes the following key provision:

> Upon the removal of a General Partner for any reason pursuant to § 9.6, the remaining or any successor General Partner shall cause the Partnership to redeem the removed General Partner's interest for [$100] and such removed General Partner shall thereafter cease to have any interest in the capital, profits, losses, distributions and all other economic incidents of ownership of the Partnership.

---

[12] Defendants suggest that the standard of review is not evident because it is not clear whether the special master reviewed the issue under a summary-disposition standard or conducted a bench trial. To determine what procedure the special master undertook, it is necessary to look at the order appointing the special master. In that stipulated order, the parties agreed that they would submit briefs to the special master "for adjudication" on the issue of whether Section 9.6 of the Partnership Agreement was an illegal penalty. Importantly, nowhere in the order does it mention that the special master was to undertake a summary-disposition analysis. And nowhere in the special master's report does it mention that he viewed the evidence he received in a light most favorable to the nonmoving party, which is a hallmark of a summary-disposition analysis. See *Corley*, 470 Mich at 278. Instead, the special master was tasked with making a discrete determination: either the provision was a penalty or it was not. Limiting the special master's resolution to only these two outcomes is inconsistent with a summary-disposition analysis because it leaves no option for there being an open question of fact, preventing any determination. See *Kisiel*, 272 Mich App at 170 (stating that a motion for summary disposition under MCR 2.116(C)(10) is properly granted only when there is no genuine question of fact). Moreover, it seems odd that if the question were a mere summary-disposition matter, why there would have been a need to refer the matter to the special master in the first instance because courts are well equipped to handle summary-disposition motions. That said, the parties stipulated to submitting the question to the special master.

Defendants contend that redeeming PPS-GP's interest for $100 is punitive, as the interest was worth substantially more—between $18 million and $32 million according to valuations prepared by Cinnaire at the time of the Partnership Agreement's execution.

"A contractual provision for liquidated damages is nothing more than an agreement by the parties fixing the amount of damages in the case of a breach of that contract." *Barclae v Zarb*, 300 Mich App 455, 485; 834 NW2d 100 (2013) (citation omitted). Liquidated damages are not a penalty "if the amount is reasonable with relation to the possible injury suffered and not unconscionable or excessive." *UAW-GM*, 228 Mich App at 508 (quotation marks and citation omitted). Liquidated damages are proper where actual damages are uncertain and difficult to determine at the time of contracting and where the liquidated amount reflects a reasonable estimate of the sustained injury or loss. *Curran v Williams*, 352 Mich 278, 282-283; 89 NW2d 602 (1958).

Here, the special master considered many factors while making his determination and found that: (1) the agreement was not unconscionable, (2) the damages were not easily calculable, (3) the parties were sophisticated, (4) the agreements were heavily negotiated, and (5) the amounts were reasonable given the overall structure and investment in the project. We see no error in those findings.

Defendants' reliance on Cinnaire's $18 to $32 million valuation is misplaced. Those valuations assumed full compliance with the Partnership Agreement, including the successful securing of all historic tax credits—an assumption that failed. Without all the historic tax credits, the value would have to be greatly reduced. As a result, given PPS-GP's failure to perform, any initial valuation of its general partner interest is speculative at best.

Moreover, given the inability of the parties to know at the time of contracting what the value of the general partner's interest would be—in the event of a hypothetical future default by the general partner—the need for a liquidated damages amount is apparent and proper. See *Curran*, 352 Mich at 282. The Partnership Agreement expressly acknowledges this:

> The above provisions regarding redemption of the interest of a removed General Partner under this § 9.6 are intended to recognize the uncertain situation that may be created by the acts of the removed General Partner justifying said removal and the substantial damage that could be incurred by the Partnership and the Investor Limited Partners if such an event occurs. The parties agree that the provisions of this § 9.6 providing for liquidation of a General Partner's interest is not considered a penalty or forfeiture but rather a fair resolution of an uncertain situation.

Thus, the special master's finding that the provision was not unconscionable, which the trial court adopted, is not clearly erroneous.

Defendants also challenge the special master's finding that they were represented by competent counsel. In support of their challenge, defendants note that they were represented by an attorney at a law firm, and that same law firm "prepared the [Partnership Agreement], reviewed the Heritage agreement for Cinnaire, and represented every party during the negotiation and drafting of the MOU." Defendants assert that this establishes that their counsel had a conflict of

interest. Even assuming these facts are true, they do not show incompetence. Indeed, MRPC 1.7 expressly allows an attorney to represent opposing clients as long as each client consents.[13] *Avink v SMG*, 282 Mich App 110, 116-117; 761 NW2d 826 (2009). It is spurious to suggest that because an attorney represents multiple parties in a transaction, that attorney necessarily is not competent. The trial court's finding of competence is therefore not clearly erroneous.

Finally, defendants contend that the Investor Limited Partners were limited to recovering either liquidated damages or actual damages, but not both. See *Curran*, 352 Mich at 286 (describing liquidated damages as being an estimate of the actual damages). However, the parties agreed that in the event of the general partner's involuntary removal, "the General Partner shall remain liable to the Partnership and the Investor Limited Partners for," among other things, "all other costs, expenses and damages . . . as a result of the occurrence of the event giving rise to or arising from such removal." Thus, the parties agreed that the general partner would remain liable for "actual damages" that arose from the general partner's breaching conduct. And this makes sense because, importantly, the $100 in Section 9.6 of the agreement was described as *a redemption price for the general partner's interest*—it was not meant to represent a liquidated-damages amount for any breach of the Partnership Agreement. Because the $100 did not purport to cover damages associated with the general partner's conduct that resulted in its removal, there is no double recovery of damages.

Affirmed.

/s/ Michael J. Kelly
/s/ Brock A. Swartzle
/s/ Matthew S. Ackerman

---

[13] Because defendants did not object to the special master's findings regarding counsel's competence, the record is silent on what, if any, consents were obtained.